**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **IRONSHORE SPECIALITY** | ) | |
| **INSURANCE COMPANY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 17 C 3541** |
| | ) | |
| **AKORN, INC. and** | ) | |
| **AKORN SALES, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

After a Georgia jury returned a verdict of over $20.5 million in compensatory and punitive damages against Akorn, Inc., the company sought to recover part of the judgment—specifically, part of the punitive damages award—from Ironshore Specialty Insurance Company, Akorn's excess liability insurer. Believing that the punitive damages were not covered by its policy, Ironshore filed this declaratory judgment action seeking a determination of its rights and duties to provide coverage to Akorn. Akorn and its subsidiary, Akorn Sales, Inc., have counterclaimed against Ironshore for breach of contract. Both parties have moved for summary judgment. For the reasons stated below, the Court grants Ironshore's motion and denies Akorn's motion.

## Background

"Summary judgment is appropriate when the admissible evidence shows that there is no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law." *Barnes v. City of Centralia*, 943 F.3d 826, 830–31 (7th Cir. 2019) (internal quotation marks omitted). Except where otherwise noted, the following facts are not in dispute.

## A.    Akorn and methylene blue

Akorn is a pharmaceutical corporation organized under the law of Louisiana with its principal place of business in Illinois. Akorn Sales is incorporated in Delaware, and its principal place of business is also in Illinois.

At the time the relevant events occurred, Akorn manufactured a prescription drug called methylene blue. As with many medications, using methylene blue is not without risks, including the possibility of adverse interactions. In 2011, the U.S. Food and Drug Administration issued two drug safety alerts for methylene blue. These alerts were preceded by and based on reports of serious central nervous system reactions when methylene blue was given to patients who were also taking serotonergic psychiatric medications. Among the classes of drugs the FDA called serotonergic psychiatric medications were selective norepinephrine reuptake inhibitors or SNRIs. Effexor XR, generically known as venlafaxine, is an SNRI.

In its first drug alert, the FDA explained that when methylene blue is given to patients taking serotonergic psychiatric medication, some patients developed serotonin syndrome. Serotonin syndrome is the buildup of high levels of serotonin in the brain. This buildup is toxic, and it can cause mental changes (e.g., confusion or memory problems), muscle problems, and trouble with coordination, among other things. The FDA's alert noted the agency had received reports that patients treated with both methylene blue and serotonergic psychiatric medications had developed several

neurological and autonomic symptoms, including coma.

The first FDA alert also warned that some healthcare professionals may not have realized that methylene blue has monoamine oxidase inhibitor (MAOI) properties. In its second drug alert, the FDA specifically noted that most of the adverse events regarding methylene blue occurred when individuals taking serotonergic psychiatric medications were undergoing parathyroid surgery, "which involved the intravenous administration of methylene blue as a visualizing agent."

Methylene blue is a "grandfathered" drug and is not subject to the FDA's approval process. Moreover, and for the same reason, the FDA has no authority to regulate or mandate labeling for methylene blue. Instead, Akorn had sole authority to decide what information to include in the drug's label. After receiving and reviewing the FDA's first drug alert, Akorn declined to change methylene blue's label to include a warning about the adverse interaction between the drug and serotonergic psychiatric medications or to inform medical professionals that methylene blue has MAOI properties. The decision to keep the label the same was made by Sam Boddapati, Akorn's senior vice president of regulatory affairs.

## B. The *Pope* Action

In 2013, Ann Pope underwent parathyroid surgery to remove a growth. Her surgeon used methylene blue as a visualization agent. Akorn manufactured and sold the methylene blue the surgeon used. Unfortunately, Pope had been using a serotonergic psychiatric medication—Effexor XR. In addition, neither her surgeon nor the pharmacist who filled the methylene blue prescription knew about the FDA drug alerts. As a result of the interaction between methylene blue and Effexor XR, either

3

during or post-surgery Pope developed a severe form of serotonin syndrome. She was placed into a medically induced coma and hospitalized for 18 days. In addition to the pain and suffering she experienced, the syndrome left her with permanent disabling injuries, including cognitive impairment.

In 2015, Pope and her husband sued Akorn and Akorn Sales in Georgia state court.[1] The Popes were Georgia residents and sued under Georgia law. The theory of the *Pope* case was that Akorn knowingly and intentionally omitted information about the serious risk of bodily harm to patients who were prescribed both a serotonergic psychiatric medication and methylene blue. In 2017, a jury found Akorn 100 percent liable for Pope's injuries and awarded her over $2.7 million in compensatory damages; her husband was awarded more than $275,000 in compensatory damages for loss of consortium. The jury also awarded the Popes $17.5 million in punitive damages. The awards were affirmed by the Georgia Court of Appeals, and the Georgia Supreme Court declined to review the case. Akorn has since satisfied the *Pope* judgment.

## C.    Akorn seeks indemnity; Ironshore files suit

Akorn's primary insurer was Chubb, but the Chubb policy limited Akorn's coverage to $10 million, inclusive of defense costs. Chubb defended Akorn and paid the balance of its policy after the affirmance. The Ironshore policy promised coverage of up to $15 million in excess of the Chubb policy. Throughout the pendency of the *Pope* case, Akorn relied on Chubb to evaluate Akorn's possible liability and exposure.

---

[1] Akorn Sales was dismissed before trial. Ironshore argues that given this fact, no judgment was entered against Akorn Sales, and thus it is not entitled to indemnification in the *Pope* case. Ironshore asks the Court for a declaratory judgment in its favor on this point. The defendants do not contest these facts or Ironshore's conclusions in its briefing. Thus, the Court confines its discussion to Akorn.

According to Akorn, neither it nor Chubb expected the award amount to exceed Chubb's coverage.[2]  Because of that assumption, Akorn did not give notice of the pending suit to Ironshore until after the verdict was announced.  Ironshore acknowledged receipt of Akorn's claim a few days later.

In Akorn's telling, Ironshore never issued a reservation of rights letter or gave notice of any reason it might deny coverage.  However, according to Ironshore, after it received notice of the *Pope* verdict, it acknowledged the Popes' claim and expressly reserved all its rights.  Akorn admits that Ironshore "sent a boiler-plate receipt of the claim" and that Ironshore stated that it had expressly reserved its rights.  Akorn's SOF ¶ 65.  Akorn denies, however, that this amounted to a proper reservation of rights.  In any event, Akorn's defense counsel told the Georgia trial court that there were no issues regarding insurance coverage.  Shortly thereafter, Ironshore filed this suit arguing that Akorn's punitive damages are not insurable under Illinois law and, alternatively, that the punitive damages awarded in *Pope* are not covered by the Ironshore policy.

Though Ironshore's initial complaint was filed in 2017, both parties asked to stay these proceedings while the *Pope* case was appealed.  The Court granted that motion and also granted the parties' later motion to dismiss the action without prejudice and with leave to reinstate.  The case was reopened in 2019.

### Discussion

When courts consider cross-motions for summary judgment, the "ordinary standards" remain in effect.  *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017).

---

[2] One reason for this expectation was that plaintiffs' pre-trial settlement demands never exceeded $2.2 million, and demands during trial never exceeded $10 million.

"It is axiomatic that the first step in the summary-judgment process is to ask whether the evidentiary record establishes a genuine issue of material fact for trial." *James v. Hale*, 959 F.3d 307, 310 (7th Cir. 2020). "A 'material fact' is one identified by the substantive law as affecting the outcome of the suit." *Hanover Ins. Co. v. N. Bldg. Co.*, 751 F.3d 788, 791 (7th Cir. 2014). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, courts must view the facts "in the light most favorable to the party opposing the . . . motion." *Scott v. Harris*, 550 U.S. 372, 378 (2007).

Generally, the party seeking summary judgment bears the initial responsibility of establishing there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When a movant seeks summary judgment on a claim "as to which it bears the burden of proof, it must lay out the elements of the claim, cite the facts which it believes satisfies these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim." *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015).

The second step in the summary-judgment process is determining whether the moving party is entitled to judgment as a matter of law. *See Barnes*, 943 F.3d at 830. When a court determines that no material fact is in dispute and that the moving party is entitled to judgment as a matter of law, it has in effect concluded that "no reasonable jury could find for the [non-moving] party based on the evidence in the record." *Martinsville Corral, Inc. v. Soc'y Ins.*, 910 F.3d 996, 998 (7th Cir. 2018) (internal

6

quotation marks omitted).  "Contract cases . . . are often prime candidates for summary judgment because contract interpretation is [typically] a question of law."  *See Hanover Ins.*, 751 F.3d at 791.

## A.    Conflict of laws

Before reaching the merits, there's a threshold issue to consider: what law governs the interpretation and effect of the Ironshore policy?  The policy itself does not have a choice of law provision, and the parties disagree about which law should apply. Ironshore argues that Illinois law applies; Akorn contends that Georgia law applies.

Though they disagree on the ultimate conclusion, the parties agree on a few preliminary aspects of the conflicts analysis.  First, the parties agree—as they must— that Illinois's choice of law rules dictate which state's law applies.  *See Gunn v. Cont'l Cas. Co.*, 968 F.3d 802, 808 (7th Cir. 2020) ("A federal court exercising its diversity jurisdiction over state-law claims applies the choice-of-law rules of the state in which it sits.").

Second, and importantly, the parties agree that there is a conflict between Illinois law and Georgia law on the insurability of punitive damages.  *See Townsend v. Sears, Roebuck & Co.*, 227 Ill. 2d 147, 155, 879 N.E.2d 893, 898 (2007) ("A choice-of-law determination is required only when a difference in law will make a difference in the outcome.").  Illinois state courts have held that "public policy prohibits insurance against liability for punitive damages that arise out of the misconduct of the insured."  *See Fox v. Am. Alternative Ins. Corp.*, 757 F.3d 680, 683–84 (7th Cir. 2014) (internal quotation marks omitted).  The converse is true in Georgia, where "it is not contrary to public policy for an insurer to pay a punitive award on behalf of an insured."  *See Hooters of*

*Augusta, Inc. v. Am. Glob. Ins. Co.*, 272 F. Supp. 2d 1365, 1377 (S.D. Ga. 2003), *aff'd*, 157 F. App'x 201 (11th Cir. 2005).

Third, and finally, the parties agree that when an insurance policy fails to include a choice of law provision, Illinois state courts apply a "most significant contacts" test to determine which state's law should govern. *See Jupiter Aluminum Corp. v. Home Ins. Co.*, 225 F.3d 868, 873 (7th Cir. 2000). The most significant contacts test is similar to the most significant relationship test outlined in the Restatement (Second) of Conflicts of Laws. *Nat'l Sur. Corp. v. Bedivere Ins. Co.*, No. 17 C 3455, 2019 WL 2743485, at *5 (N.D. Ill. July 1, 2019). Under the Illinois test, "insurance policy provisions are generally governed by the location of the subject matter, the place of delivery of the contract, the domicile of the insured or of the insurer, the place of the last act to give rise to a valid contract, the place of performance, or other place bearing a rational relationship to the general contract." *Jupiter Aluminum, 225* F.3d at 873 (citing *Lapham–Hickey Steel Corp. v. Protection Mut. Ins. Co.*, 166 Ill. 2d 520, 655 N.E.2d 842, 845 (1995)).

Courts weigh each of these factors "according to its relative importance to the issues involved." *Nat'l Sur. Corp.*, 2019 WL 2743485, at *5. Typically, "the location of the insured risk is given special emphasis." *Jupiter Aluminum, 225* F.3d at 873 (internal quotation marks omitted). "However, the location of the subject matter of the contract, such as the location of the risk insured by an insurance policy, is entitled to little weight when the subject matter or risk is located in more than one state." *Id.* at 873–74 (internal quotation marks omitted). "The location of the underlying action" may "be considered as an additional relevant factor," but it is not dispositive. *Westchester Fire Ins. Co. v. G. Heileman Brewing Co.*, 321 Ill. App. 3d 622, 630, 747 N.E.2d 955, 962

8

(2001). In particular, the location of the underlying action has "little to no significance" in the analysis when the policy "cover[s] risks nationwide and [does] not specifically state the location of the risk." *Id.*

Turning now to the facts before the Court, the location of the subject matter— here, the location of the risk insured by the policy—is across multiple states. *See Emerson Elec. Co. v. Aetna Cas. & Sur. Co.*, 319 Ill. App. 3d 218, 232, 743 N.E.2d 629, 640 (2001). This factor therefore has little, if any significance, to the conflicts analysis. *See Jupiter Aluminum, 225* F.3d at 873; *Emerson Elec.*, 319 Ill. App. 3d at 232, 743 N.E.2d at 640 ("'Situations . . . where the location of the risk has less significance, include where the policy covers a group of risks that are scattered throughout two or more states.'" (quoting Restatement (Second) of Conflict of Laws § 193 (1971) (alterations accepted)). For the same reason, the fact that Georgia was the location of the underlying action is also of little significance. *See Westchester Fire Ins.*, 321 Ill. App. 3d at 630, 747 N.E.2d at 962.

"The place of the last act giving rise to the policies is the state where the policies were delivered and where the premiums were paid." *G.M. Sign, Inc. v. Pennswood Partners*, Inc., 2015 IL App (2d) 121276-B, ¶ 43, 40 N.E.3d 169, 181. It is undisputed that Akorn received the Ironshore Policy in Illinois and paid its premiums for the policy from its Lake Forest, Illinois office. *Cf. id.* These facts favor the application of Illinois law.

"Where there is no express agreement as to the place of performance, it may be determined according to the intent of the parties, namely, the intended place of the insurer's payment of claims under the policy." *Emerson Elec.*, 319 Ill. App. 3d at 234,

9

743 N.E.2d at 641.  If the parties' intent regarding the place of the insurer's payment is in doubt, courts may look to the location of the insured.  *See id.*  Here, the parties have not made any arguments related to the policy's place of performance.  Even if they had, this factor would have little significance as "courts place little weight on the place of performance when the insured is located in more than one state."  *See Nat'l Sur. Corp.*, 2019 WL 2743485, at \*7.

In determining the domiciles of the insured and insurer, Illinois courts consider the parties' states of incorporation and their principal place of business.  *Id.* (citing *Westchester Fire Ins.*, 321 Ill. App. 3d at 630, 747 N.E.2d at 962; *Emerson Elec.*, 319 Ill. App. 3d at 235, 743 N.E.2d at 642).  Ironshore's place of incorporation is Arizona, and its principal place of business is in Massachusetts.  Akorn's place of incorporation is Louisiana, and its principal place of business is in Illinois.  To determine the domicile with the most significant contacts, Illinois courts have looked to the location that "played an active, dominant and dynamic role in the procurement" of the insurance policy, *see Emerson Elec.*, 319 Ill. App. 3d at 235, 743 N.E.2d at 642, as well as to the location that may fairly be described as the "'nerve center' of the entity."  *Westchester Fire Ins.*, 321 Ill. App. 3d at 630, 747 N.E.2d at 962.  In the liability insurance context, when the insured is headquartered in the same state where the policies were delivered, "that state's law will generally govern all coverage disputes."  *See Emerson Elec.*, 319 Ill. App. 3d at 235, 743 N.E.2d at 642 (internal quotation marks omitted) (citing 4 Appleman on Insurance 2d § 21.11 (1998)).

In this case, Illinois is the location of Akorn's nerve center and of the particular business unit that played an active role in procuring the policy.  Corporations have "a

single principal place of business" where their headquarters are located, as headquarters are "the location of decision making." *Westchester Fire Ins.*, 321 Ill. App. 3d at 630, 747 N.E.2d at 962. There's no question that Akorn's principal place of business is in Illinois, as its headquarters are in this state and its principal officers work here. Additionally, the selling and marketing of Akorn's products is coordinated from Illinois. And Akorn's central distribution warehouse and its research and development center are in Illinois. Moreover, Akorn's Illinois headquarters undoubtedly "played an active, dominant and dynamic role in the procurement" of the insurance policy given that the Akorn employees involved in procuring and binding the policy did so from Illinois. *See Emerson Elec.*, 319 Ill. App. 3d at 235, 743 N.E.2d at 642.

In sum, three factors weigh in favor of Illinois law—the place of delivery of the contract, the domicile of the insured or of the insurer, and the place of the last act to give rise to a valid contract. Two factors—the location of the subject matter and the location of the underlying action—have little to no significance in the analysis. Importantly, none of the most significant contacts test's factors weigh in favor of applying Georgia law. It would seem then that the most significant contacts test favors applying Illinois law to this dispute.

This, however, is not the end of the inquiry. It is not enough to simply "count contacts." *Chi v. Loyola Univ. Med. Ctr.*, 787 F. Supp. 2d 797, 801 (N.D. Ill. 2011) (Kennelly, J.). The Court must also evaluate the contacts "in light of the relevant policies of the forum and other interested states, as well as those states' interest in the

issue."[3]  *Westchester Fire Ins.*, 321 Ill. App. 3d at 629, 747 N.E.2d at 961; *see also* Restatement (Second) of Conflict of Laws § 6.  "In addition, consideration should also be given to the justified expectations of the parties, to the predictability and uniformity of the result, and to the ease in the determination and application of the law to be applied." *Shelton v. Allstate Northbrook Ins. Co.*, 2018 IL App (2d) 170548-U, ¶ 20; see *also* Restatement (Second) of Conflict of Laws § 6.

Akorn argues that Georgia's interest is in both regulating the insurers who issue polices covering underlying claims that occur in the state and in the punitive damages assessed in cases like *Pope.*  If that's the case, Georgia's interests have been achieved.  It is undisputed that Akorn has paid and satisfied the *Pope* judgment.  This is not a case where, absent insurance, a judgment will go unsatisfied.  Thus, the heart of the matter before the Court— the insurability of the punitive damages the Georgia jury imposed—would not have any effect on the *Pope* action, Georgia's citizens at large, or Georgia's ability to regulate the conduct of insurers within that state.  *Cf. Int'l Surplus Lines Ins. Co. v. Pioneer Life Ins. Co. of Ill.*, 209 Ill. App. 3d 144, 157, 568 N.E.2d 9, 16 (1990)  ("Application of Arizona law in this case will have virtually no effect on the

---

[3] Akorn hangs its hat on this portion of the conflicts analysis and seemingly contends that these more general principles should outweigh the more specific most significant contacts test.  *See* Akorn Br. 15–18.  That's not right.  The Illinois Supreme Court has said it believes "the bench and bar have overemphasized the general sections of the Second Restatement of Conflict of Laws"—e.g., the factors listed in section 6 of the Restatement—"and have undervalued the specific presumptive rules."  *Barbara's Sales, Inc. v. Intel Corp.*, 227 Ill. 2d 45, 62, 879 N.E.2d 910, 920 (2007) (internal quotation marks omitted).  The proper calculus requires that after a court "chooses a presumptively applicable law under the appropriate jurisdiction-selecting rule," it must then test that choice "against the principles of § 6 in light of relevant contacts [previously] identified."  *See Townsend*, 227 Ill. 2d at 164, 879 N.E.2d at 903 (internal quotation marks omitted).

citizens of Illinois, and Illinois has little interest in regulating the conduct of insurers whose contracts relate to citizens of other States."). Conversely, Illinois has a strong interest in a case involving an Illinois insured who seeks insurability of damages under an insurance policy that has significant contacts with Illinois. *See supra* at 9–12. And, as discussed in detail below, Illinois has professed an interest in preventing Illinois insureds from taking advantage of their wrong by passing certain punitive damages onto their insurers. *See Beaver v. Country Mut. Ins. Co.*, 95 Ill. App. 3d 1122, 1124, 420 N.E.2d 1058, 1060 (1981).

Regarding Georgia's relevant policies, the Illinois Supreme Court has said that "Illinois courts have an interest in not being burdened with applying foreign law in the absence of strong policy reasons and a strong connection to the case." *See Barbara's Sales, Inc. v. Intel Corp.*, 227 Ill. 2d 45, 62, 879 N.E.2d 910, 920 (2007). Though Akorn has identified a number of Georgia's purported interests, it has not provided any strong policy reasons that would support the application of Georgia law, and the Court is not able to identify any. Furthermore—as demonstrated above—Georgia's strongest connections are to the underlying case, and it has no strong connection to the present insurance-related dispute. *See supra* at 12. As for Illinois, it has a strong policy reason and strong connections that support the application of its law. To repeat, Illinois has a public policy that prevents its insureds from passing certain of their punitive damages onto insurers, and Illinois is the common denominator for many of the facts relating to the insurance policy's formation and implementation. *See supra* at 9–13.

The final factors to consider are " the justified expectations of the parties," "the predictability and uniformity of the result," and "the ease in the determination and

application of the law to be applied." *Shelton*, 2018 IL App (2d) 170548-U, ¶ 20. These too weigh in favor of applying Illinois law. Illinois is where Akorn is headquartered and where the policy was delivered; it is "the one jurisdiction which tie[s] all the parties together . . . [and] 'the location which appear[s] to be most likely contemplated by the parties' as the source of law.'" *See Emerson Elec.*, 319 Ill. App. 3d at 235, 743 N.E.2d at 642. These facts are "consistent with the Restatement's principle that the justified expectations of the parties are to be protected" and "comport[ ] with the Restatement's emphasis on predictability and uniformity of result, and on ease in determination and application of the law to be applied." *See id.*

For these reasons, the Court concludes that Illinois law governs the parties' dispute. Akorn's counterarguments do not disturb this conclusion. Akorn first argues that rather than applying the most significant contacts test—which Akorn calls "rigid" and "formulaic"—the Seventh Circuit "has taken a different approach." Akorn's Br. at 15 (citing *Lee v. Interstate Fire & Cas. Co.,* 86 F.3d 101, 103 (7th Cir. 1996)). However, the quote Akorn seizes upon to make its point is one that describes the most significant contacts test, not one that alters it. *See Lee*, 86 F.3d at 103 (describing the Illinois most significant contacts test as "not choos[ing] between the old, formal approach and the modern, 'contacts' approach" but "instead includ[ing] elements of both, without offering any guidance for what happens when a contract of insurance is delivered in one state but covers a risk in another."). In short, it's not accurate to say that the Seventh Circuit "has taken a different approach" or that the most significant contacts test's factors are outdated or have been modified. In fact, since *Lee*, the Seventh Circuit has continued to apply the most significant contacts test as set out in the Illinois Supreme Court's

decision in *Lapham-Hickey*. *See, e.g.*, *Jupiter Aluminum*, 225 F.3d at 873; *Auto-Owners Ins. Co. v. Websolv Computing, Inc.*, 580 F.3d 543, 547 (7th Cir. 2009).

Akorn also argues that because "Georgia law applied to the Chubb Policy" and Chubb insured the punitive damages award up to the limits of its policy, it would be "absurd" to apply Illinois law to the Ironshore policy and thus deny coverage for the rest of the punitive damages award. Akorn's Br. at 18 (internal quotation marks omitted). To support this claim, Akorn cites *Lee,* where the Seventh Circuit said that "[t]wo policies with identical language covering the same risk should have identical effects." *See Lee*, 86 F.3d at 103.

*Lee* centered around an excess policy (from Interstate Fire & Casualty Company) that shared identical terms with the primary policy (underwritten by Lloyd's of London and Centennial Insurance Company). *Id.* at 102–03. Though the panel noted that the Illinois Supreme Court in "*Lapham–Hickey* chose the place of the policy's delivery, rather than the place of the insured risk, to supply the law for an insurance contract," the panel reasoned it "would be absurd if the primary policy were governed by United Kingdom law, and the excess policy by Illinois law, just because that is the location of the insurers (and therefore of the last acts necessary to make the insurance effective)." *Id.* at 103. Instead, the panel concluded that Illinois law would not favor the application of "multiple bodies of law to a single disputed term." *Id.* The panel supported its conclusion by noting that *Lapham-Hickey* involved "a single policy cover[ing] risks in many states, so applying the law of the delivery state produced a consistent interpretation." *Id.*

Turning to the present case, it's worth noting that there is no prior court decision

that applied Georgia law to the Chubb policy. And Chubb's decision to pay its policy limits does not mean that it believed Georgia law applied to its policy. Finally, even if Chubb believed Georgia law applied to its policy, Akorn has not explained why Chubb's interpretation should be binding on Ironshore or why that interpretation would constrain the Court's conflicts analysis.

In any event, assuming this case implicates the concerns discussed in *Lee*, applying Illinois law to the Ironshore policy would not prevent consistent interpretation of that policy and the Chubb policy.[4] As Ironshore notes, Chubb's policy may be subject to Illinois law as well. The Chubb policy has no choice of law provision, so the same factors would apply in determining the applicable law. Though there is not much in the record, application of Illinois law may be favored because Illinois is Akorn's domicile. *See Emerson Elec.*, 319 Ill. App. 3d at 235, 743 N.E.2d at 642 (citing 4 Appleman on Insurance 2d § 21.11 (1998) ("[W]here the insured is headquartered in one state where the policies were delivered, that state's law will generally govern all coverage disputes.'"). Illinois is also the location where the policy was negotiated and the location where Chubb contributed the balance of its policy limits toward satisfaction of the judgement. In short, Akorn's argument is overstated, as it is not certain that applying

---

[4] The Court is not convinced this case implicates the concerns involved in *Lee*. What the *Lee* panel found "absurd" was the idea of two polices governing the same risk being subject to different bodies of law solely based on the locations of the two insurers. *Lee*, 86 F.3d at 103; *see also Evangelical Lutheran Church in Am. v. Atl. Mut. Ins. Co.*, 169 F.3d 947, 950 (5th Cir. 1999) ("The *Lapham–Hickey* court placed some emphasis on the domicile of the insured, but no emphasis on the insurer's domicile, which was not even identified."). Here, the Court has considered the location of both the insured and insurer and found that Illinois law applies because the place of delivery of the policy, the domicile of the insured, and the place of the last act to give rise to the policy are all Illinois. That's all true because of Akorn's domicile, not because of Ironshore's.

Illinois law to the Ironshore policy would prevent the consistent interpretation of that policy and the Chubb policy.

For all these reasons, the Court concludes that Illinois law governs this case.

## B.   Insurability of the punitive damages

The next issue for consideration is the insurability of the damages imposed against Akorn.   "[I]n Illinois, public policy prohibits insurance against liability for punitive damages that arise out of the misconduct of the insured.'"  *Fox*, 757 F.3d at 683–84 (citing *Crawford Labs., Inc. v. St. Paul Ins. Co. of Illinois*, 306 Ill. App. 3d 538, 544, 715 N.E.2d 653, 659 (1999)); *see also Mortenson v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 249 F.3d 667, 672 (7th Cir. 2001) ("[T]he rule in Illinois . . . forbids certain types of insurance as being against public policy because of the acute moral hazard that the insurance creates . . . . a rule that Illinois courts have extended to punitive damages.").

In *Beaver*, 95 Ill. App. 3d 1122, 420 N.E.2d 1058, the Illinois appellate court favorably and extensively cited the Fifth Circuit's decision in *Northwestern National Casualty Co. v. McNulty*, 307 F.2d 432 (5th Cir. 1962) to explain the various reasons for this public policy.  The policy against insuring for punitive damages exists because it "would contravene public policy" to allow one "to take advantage of his own wrong." *Beaver*, 95 Ill. App. 3d 1122, 1124, 420 N.E.2d 1058, 1060 (internal quotation marks omitted).   "If [a] person were permitted to shift the burden to an insurance company, punitive damages would serve no useful purpose" because "[s]uch damages do not compensate the plaintiff for his injury, since compensatory damages already have made the plaintiff whole." *Id.*

That said, Illinois public policy does not prohibit the insurability of all punitive

damages.  Instead, the "line prohibiting the protection of insurance is drawn . . . not between negligent conduct and intentional conduct, but between negligent conduct and the kind of unintentional conduct for which punitive damages may be imposed."  *Id.* at 1125, 420 N.E.2d at 1060.

In this case, Akorn seeks indemnity for the remaining punitive damages from the *Pope* judgment, i.e. the damages intended to punish it.  There can be no question that Akorn was negligent.  Akorn does not dispute that it knew of the FDA drug alerts or that Boddapati, its vice president for regulatory affairs, decided to forgo updating methylene blue's label.  Moreover, the Georgia Court of Appeals concluded that there was sufficient evidence Akorn had breached its legal duty to warn because

> Akorn was aware that patients had experienced significant injuries when methylene blue was combined with certain common psychiatric medications; that many healthcare professionals were unaware of methylene blue's serotonergic properties; and that with this knowledge, Akorn made a deliberate decision not to amend the methylene blue label or otherwise take any action to warn healthcare providers.

Dkt. no. 130-4 ECF pg. 29 of 42.  Because punitive damages were imposed due to Akorn's negligence, under Illinois law it was not reasonable for Akorn to expect insurance coverage for those damages.  *See Crawford Labs.*, 306 Ill. App. 3d at 544, 715 N.E.2d at 659.

Akorn's arguments to the contrary are unavailing.  It contends that Illinois's public policy against the insurability of certain punitive damages is overridden by "the countervailing public policy in favor of an insurer fulfilling their contractual obligations."  Akorn Br. at 18.  To support its viewpoint, Akorn cites *Old Republic Insurance Co. v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, No. 03 V 5238, 2006 WL 88666 (N.D. Ill. Jan. 11, 2006).  The court in *Old Republic* denied summary judgment to an

insurer who invoked the Illinois public policy against insuring certain punitive damages because it determined that Illinois had a "stronger and more fundamental policy . . . that when payment of a premium is made by an insured and accepted by the insurance company and coverage is promised in return therefor, the insurer should be required to fulfill its contractual obligations." *Id.* at *18 (quoting *Int'l Surplus Lines Ins. Co. v. Pioneer Life Ins. Co. of Illinois*, 209 Ill. App. 3d 144, 157, 568 N.E.2d 9, 17 (1990)).

The Court is not persuaded by the holding in *Old Republic*. *International Surplus*, the case *Old Republic* relies upon, is distinguishable. First, the court applied Arizona law, not Illinois law. *Int'l Surplus*, 209 Ill. App. 3d at 158, 568 N.E.2d at 17. Second, the policy provision at the heart of *International Surplus* was a separate endorsement called the "Punitive Damages Extension" which said: "In consideration of the premium charged hereunder, it is understood and agreed that the term 'loss' shall include punitive damages, but only where permitted by law." *Id.* at 149, 568 N.E.2d at 11. Though the *International Surplus* insurer argued that "where permitted by law" should be interpreted as referring to Illinois law, the court determined that phrase "unambiguously refer[red] to the State in which the risk [was] located and the claim for punitive damages [arose]"— Arizona. *Id.* at 150, 568 N.E.2d at 12. The court found it "significant that an additional, higher premium was charged for this supplemental coverage," and so it concluded that because the premium was paid and accepted, and the insurer promised coverage in return, "the insurer should be required to fulfill its contractual obligations." *Id.* at 150, 157, 568 N.E.2d at 12, 17. Here, by contrast, there is no policy term similar to the one in *International Surplus*, and the Court has determined Illinois law applies.

To the extent that Akorn argues that *International Surplus* can be applied beyond

its facts—as it was in *Old Republic*—there is not much support for this.  The *International Surplus* holding is not mentioned in *Crawford Laboratories*—a more recent Illinois appellate court case—even though the court there explicitly held that Crawford Laboratories could not reasonably expect coverage from its insurer due, in part, to Illinois's public policy prohibiting insurance "against liability for punitive damages that arise out of the misconduct of the insured."  *Crawford Labs.*, 306 Ill. App. 3d at 544, 715 N.E.2d at 659.  In fact, *International Surplus*, has only been cited on this point twice:  by the court in *Old Republic* and in an Illinois appellate court decision from 1992.  *See Univ. of Illinois v. Cont'l Cas. Co.*, 234 Ill. App. 3d 340, 351, 599 N.E.2d 1338, 1346 (1992).

Next, Akorn argues that adopting the Illinois public policy would mean that an Illinois company could never been insured for punitive damages.  That's not true as the bar for coverage only effects negligent misconduct.  *See Beaver*, 95 Ill. App. 3d at 1125, 420 N.E.2d at 1060.  And, as *International Surplus* demonstrates, there are cases in which an Illinois company commits negligent misconduct and the insurability of punitive damages is still permitted by the law of another state.  *Int'l Surplus*, 209 Ill. App. 3d at 150, 568 N.E.2d at 12.  But even if Akorn was right, the parade of horribles goes the other way too:  if Akorn's view prevailed, Illinois's public policy against the insurability of punitive damages would be meaningless.  Rather than punishing the wrongdoer, punitive damages would punish the insurance company and eventually the public—the very outcomes the Illinois courts have suggested the public policy is intended to prevent.  *See Beaver*, 95 Ill. App. 3d at 1124–25, 420 N.E.2d at 1060 ("[T]here is no point in punishing the insurance company; it has done no wrong.  In actual fact . . . the

20

burden would ultimately come to rest not on the insurance companies but on the public, since the added liability to the insurance companies would be passed along to the premium payers. Society would then be punishing itself for the wrong committed by the insured.").

Akorn's final assertion is that because the Georgia and Illinois standards for punitive damages are different, Illinois public policy cannot bar insurability. *Compare* Ill. Pattern Jury Instr.-Civ. 35.01 (punitive damages may be awarded if a jury finds that defendant's conduct was fraudulent, intentional, or willful and wanton) *with* Ga. Code Ann. § 51-12-5.1(b) (stating that punitive damages may be awarded in tort actions when the "defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences."). Specifically, Akorn argues that because Georgia law permits punitive damages based on a lower level of fault than Illinois does, the rationale for the Illinois prohibition against the insurability of punitive damages does not apply. This argument ignores the Illinois appellate court's holding in *Beaver*: "[t]he line prohibiting the protection of insurance is drawn . . . not between negligent conduct and intentional conduct, but between negligent conduct and the kind of unintentional conduct for which punitive damages may be imposed." *Beaver*, 95 Ill. App. 3d at 1125, 420 N.E.2d at 1060. "Conscious indifference," the lowest threshold for imposition of punitive damages under Georgia law, plainly does not fall on the "unintentional conduct" side of that line. In fact, *Beaver* cites *McNulty* for its description of "the nature of the misconduct intended to be deterred by the imposition of punitive damages," which includes "action or inaction having such a *conscious disregard* of others that a jury

21

might fairly infer" wrongdoing from the circumstances. *See Beaver*, 95 Ill. App. 3d at 1125, 420 N.E.2d at 1060 (emphasis added).

For these reasons, the Court concludes that Akorn is not entitled to indemnification of its excess punitive damages due to Illinois public policy. *See Crawford Labs.*, 306 Ill. App. 3d at 544, 715 N.E.2d at 659.

### Conclusion

For the reasons stated above, the Court grants Ironshore's motion for summary judgment [dkt. no. 128]. Because the Court has determined Ironshore has no responsibility to indemnify Akorn's excess punitive damages, it follows that Ironshore did not breach the policy. The Court therefore denies the defendants' cross-motion for summary judgment [dkt. no. 138].[5] The Court directs the Clerk to enter judgment in favor of the plaintiff and against the defendants.



_____
MATTHEW F. KENNELLY
United States District Judge

Date: June 11, 2021

_____

[5] Because the Illinois law bars the insurability of Akorn's punitive damages, the Court need not consider the parties' additional arguments regarding the interpretation of the policy and the application of the FDA exclusion.